1
2
3
4
5

## UNITED STATES DISTRICT COURT

6

## DISTRICT OF NEVADA

7

* * *

8 | NAYANANANDA RATNAYAKE,

Case No. 2:11-cv-01668-APG-CWH

9 | Plaintiff,

10 | v.

**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

11 | FARMERS INSURANCE EXCHANGE, d/b/a FARMERS,

12 | Defendant.

(Dkt. ##29, 33)

13
14
15        On September 14, 2011, Nayanananda Ratnayake ("Ratnayake") filed his complaint in the

16 District Court of Clark County, Nevada. Defendant Farmers Insurance Exchange ("Farmers")

17 removed the action to this Court on October 14, 2011 under the Class Action Fairness Act's grant

18 of diversity jurisdiction for class actions above a certain size. 28 U.S.C. § 1332(d).[1] The parties

19 dispute whether Ratnayake's three auto insurance policies with Farmers provide for the

20 "stacking" of underinsured motorist ("UIM") benefits under the policies' uninsured motorist

21 ("UM") provisions.

22        During the relevant time frame, Ratnayake had three separate policies with Farmers—one

23 for each of his family's cars. The policies for his Honda, Nissan, and Toyota were effective on

24 January 22, 2010, April 11, 2010, and April 20, 2010, respectively. (Docs. 29-1, 29-3, 29-5.)

25 Each policy included uninsured motorist ("UM") coverage for bodily injury in the amount of

26 $50,000 for each person and $100,000 for each occurrence ("50/100 coverage"). (*E.g.*, Doc. 29-2

27 ───────────────

28        [1] Ratnayake has not challenged the removal of this case to federal court.

at 10.)  Ratnayake paid a separate premium for UM coverage in each policy: $43.30 in the Honda policy; $110.00 in the Nissan policy; and $150.30 in the Toyota policy.  Each policy also contained the same exclusions to the UM coverage and an Endorsement that purported to prohibit any stacking of UM coverages (the "Endorsement").  (*E.g.*, Doc. 29-1 at 20.)  The relevant differences between the policies are described below.

On May 21, 2010, Ratnayake was in an accident while driving his Honda and allegedly suffered severe injuries.  The tortfeasor was underinsured to cover Ratnayake's alleged damages. Ratnayake sought coverage under each policy's UM provision (which included UIM coverage), asserting that each policy provided separate coverage for his injuries.  Farmers paid him $50,000 under the Honda policy but refused to pay UIM coverage under the Nissan and Toyota policies. Farmers asserted that the Endorsement was a valid anti-stacking limitation that limited Ratnayake's recovery to the UM limit under the policy that covered the particular car he was driving during the accident: the Honda policy.  Ultimately, Ratnayake filed this lawsuit.

Ratnayake pleads six claims for relief: (1) an "underinsured motorist claim," asserting that Farmers is obligated to pay $50,000 in UIM benefits under the Toyota policy and $50,000 in UIM benefits under the Nissan policy; (2) breach of the implied covenant of good faith and fair dealing (e.g., common law bad faith); (3) unfair claims practices under NRS § 686A.310(1)(a), (c), and (f); (4) unjust enrichment, for retaining funds he claims are owed to him; (5) declaratory relief, that "Farmers failed to honor its obligations under the subject insurance policies . . . and that Farmers is liable for all damages inflicted by its wrongful conduct and refusal to abide by the terms of the subject insurance policies[;]" and (6) fraud/intentional misrepresentation, for inducing Ratnayake to not seek UIM coverage under the Nissan policy by providing him with falsified policy documents.  Ratnayake pleads the first five claims as a class action with three subclasses and the Sixth Claim in his individual capacity.[2]

On October 3, 2012, Farmers filed a motion for judgment on the pleadings, arguing that the Endorsement is a valid anti-stacking limitation as a matter of law and thus Ratnayake cannot

---

[2] The court does not determine herein whether to certify a class action under Rule 23.

1  maintain his claims. (Dkt. No. 29.)  Ratnayake counters that the Endorsement is invalid because

2  its language is unclear to a layperson, and because Ratnayake paid for separate coverage on the

3  same risk.

4        Ratnayake filed a motion for partial summary judgment on his First and Fifth Claims

5  (uninsured motorist and declaratory relief). (Dkt. No. 33.)  Unsurprisingly, Ratnayake argues that

6  the Endorsement is invalid as a matter of law.  Farmers responds that, at the least, there is a

7  genuine issue of material fact as to whether Ratnayake paid for separate coverage on the same

8  risk.  The Court addresses each motion in turn.

9  **I.   Farmer's Motion for Judgment on the Pleadings**

10        **A.  Legal Standard – Judgment on the Pleadings**

11        The review standard for a motion for judgment on the pleadings under Rule 12(c) is

12  "functionally identical" to that for a motion to dismiss for failure to state a claim under Rule

13  12(b)(6).  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir.

14  2011).  District courts must apply a two-step approach when considering motions to dismiss

15  under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  First, the court must accept as

16  true all well-pleaded factual allegations; legal conclusions, however, are not entitled to the same

17  assumption of truth. *Id.* at 679.  Mere recitals of the elements of a cause of action, supported only

18  by conclusory statements, do not suffice. *Id.* at 678.

19        Second, the court must consider whether the factual allegations in the complaint allege a

20  plausible claim for relief. *Id.* at 679.  A claim is facially plausible when the complaint alleges

21  facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged

22  misconduct. *Id.* at 663.  Where the complaint does not permit the court to infer more than the

23  mere possibility of misconduct, the complaint has "alleged—but it has not shown—that the

24  pleader is entitled to relief." *Id.* at 679 (internal quotation marks and citation omitted).  When the

25  claims have not crossed the line from conceivable to plausible, the complaint must be dismissed.

26  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court also may dismiss a claim if its

27

28

1  inadequacy as pled in the complaint is "apparent as a matter of law." *Hernandez v. McClanahan*,

2  996 F. Supp. 975, 979 (N.D. Cal. 1998).

3        Claims for fraud must meet the heightened pleading standard of Rule 9(b), which provides

4  that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances

5  constituting fraud or mistake." FED. R. CIV. P. 9(b). The element of intent, however, "may be

6  alleged generally." *Id.* The Rule 9(b) standard applies only to the Sixth Claim for Relief.

7                      **Legal Standard – Anti-Stacking Limitations**

8        A valid anti-stacking provision must satisfy three prerequisites under NRS

9  687B.145(1).[3] "First, the limiting provision must be expressed in clear language. Second, the provision must be prominently displayed in the policy, binder or endorsement. Finally, the insured must not have purchased separate coverage on

10  the same risk nor paid a premium calculated for full reimbursement under that coverage."

11

12  *Nationwide Mut. Ins. Co. v. Coatney*, 42 P.3d 265, 267 (Nev. 2002) (quoting *Neumann v.*

13  *Standard Fire Ins. Co. of Hartford, Conn.*, 699 P.2d 101, 103 (Nev. 1985)). "[T]he burdens of

14  persuasion and production on the issue of the validity of an anti-stacking clause prohibiting

15  stacking of UM coverage rest on the insurer." *Torres v. Farmers Ins. Exch.*, 793 P.2d 839, 842

16  (Nev. 1990). Ratnayake contests only the first and third elements of this test: clarity and single

17  payment.

18        The clarity of an anti-stacking limitation is a question of law. *Id.* at 842. The language

19  "must not only be clearly written, it must not be difficult to understand. . . . [I]t must be truly

20

21

22      [3] The full text of Nevada's anti-stacking statute, NRS § 687B.145(1) is:

23       Any policy of insurance or endorsement providing coverage under the provisions of NRS 690B.020 or other policy of casualty insurance may provide that if the insured has

24       coverage available to the insured under more than one policy or provision of coverage, any recovery or benefits may equal but not exceed the higher of the applicable limits of

25       the respective coverages, and the recovery or benefits must be prorated between the applicable coverages in the proportion that their respective limits bear to the aggregate of

26       their limits. Any provision which limits benefits pursuant to this section must be in clear language and be prominently displayed in the policy, binder or endorsement. Any

27       limiting provision is void if the named insured has purchased separate coverage on the same risk and has paid a premium calculated for full reimbursement under that coverage.

28

4

1   comprehensible to the average insured." *Serrett v. Kimber*, 874 P.2d 747, 750 (Nev. 1994)

2   (internal quotation marks and citation omitted).

3         To satisfy the third element, called "single payment," an affidavit of the insurer's

4   employee without factual support is insufficient. *Id.* at 751. Testimony by the insurer's actuary

5   explaining how the premiums were calculated is sufficient, however. *Coatney*, 42 P.3d at 268.

6   The insurer also meets its burden if each successive policy has a lower UM/UIM premium.

7   *Jackoby v. GEICO Gen. Ins. Co.*, 2012 WL 3598817 at *3 (D. Nev. 2012). Although this Court

8   has held that the insurer also meets its burden if the insured paid "separate premiums for each

9   policy," *Farmers Ins. Exch. v. Lawless*, 680 F. Supp. 2d 1238, 1243 (D. Nev. 2010), there still

10   must be proof that the separate payments were not for the same UM/UIM risk. In other words,

11   evidence of separate premiums alone is insufficient. *Cf. Styles v. State Farm Mut. Auto. Ins. Co.*,

12   2007 WL 2688891 at *4 (D. Nev. 2007) (holding that affidavit and supporting documentation

13   showing 20% UM/UIM discount for multi-coverage were sufficient).

14         **B. Application**

15           **1. Clarity**

16         The parties contest only the clarity of the Endorsement itself, rather than other language in

17   the policies. Nevertheless, the Court must assess the meaning of the policies to determine what

18   the Endorsement purports to limit and what coverages they provide to Ratnayake if the

19   Endorsement is void. The policy section titled "PART II – UNINSURED MOTORIST, Coverage

20   C – Uninsured Motorist" states:

21        We will pay all sums which an **insured person** is legally entitled to recover as
        **damages** from the owner or operator of an **uninsured motor vehicle** because of
22        **bodily injury** sustained by the injured person. The **bodily injury** must be caused
        by an **accident** and arise out of the ownership, maintenance or use of the
23        **uninsured motor vehicle**.

24   (Dkt. No. 29-3 at 13 (emphasis in original).) For the purposes of uninsured motorist coverage,

25   "insured person" means: (a) "You or a family member" (Class I insureds); and (b) "any other

26   person while **occupying** the car described in the Declarations" (Class II insureds). (*Id.* (emphasis

27   in original).) Taken together, this means that Class I insureds enjoy UM coverage regardless of

28

1    what vehicle they are in.  Put differently, the Nissan policy affords UM coverage to Class I

2    insureds while they are in the Honda and Toyota.  There is no dispute that Ratnayake is a Class I

3    insured.

4         The policies define "uninsured motor vehicle" to include underinsured motorists, although

5    the term "underinsured motorist" is not used.  Specifically, an "uninsured motor vehicle" includes

6    "a **motor vehicle** which is: . . . [i]nsured by a **bodily injury** liability bond or policy at the time of

7    the **accident** which provides coverage in amounts less than the damages which the **insured**

8    **person** is legally entitled to recover from the owner or operator of that vehicle."  (*Id.* at 14

9    (emphasis in original).)

10        The policies also include an important exclusion to UM coverage:

11            This coverage does not apply while **occupying** any vehicle owned by you or a
             **family member** for which insurance is not afforded under this policy or through
12            being struck by that vehicle.  This exclusion only applies to those **damages** which
             exceed the minimum limits of liability required by Nevada law for **Uninsured**
13            **Motorist** coverage.

14   (*Id.* (emphasis in original).)  The first sentence prohibits stacking, and the second sentence applies

15   this prohibition only to the coverage amount above the statutory minimum of $15,000 per person

16   and $30,000 per incident ("15/30 coverage").  In short, the policies allow Class I insureds to stack

17   the 15/30 coverage amounts but prohibit stacking for any amounts over that.  Farmers agrees with

18   this interpretation.  (Dkt. No. 37 at 7 (This exclusion "limited the portability of each UM coverage

19   among Plaintiff's owned vehicles to the minimum amount required by law.").)

20        Put more directly, the Nissan policy included 50/100 coverage for Class I insureds for

21   bodily injury suffered in the Nissan and 15/30 coverage for Class I insureds for bodily injury

22   suffered in the Honda or Toyota.  Likewise, the Honda policy provided 50/100 coverage for the

23   Honda and 15/30 coverage for the Nissan and Toyota, and the Toyota policy provided 50/100

24   coverage for the Toyota and 15/30 coverage for the Nissan and Honda. Each policy provided

25   separate coverage for the *same* risk—that a Class I insured would suffer bodily injury from an

26   uninsured motorist while occupying any of the three cars.

27

28

1    The Endorsement supersedes any contrary language in the policies.  (Dkt. No. 29-1 at 21.)

2    If it is valid, the Endorsement prohibits the stacking of the 15/30 coverages allowed under the

3    policies themselves.  Consequently, the crucial issue is whether the Endorsement is valid.  In

4    relevant part, the Endorsement states:

5        **Part II – Uninsured Motorist**
         **Coverage C – Uninsured Motorist Coverage**
6        **Limits of Coverage**

7        The LIMITATIONS ON STACKING COVERAGES provisions have been
         changed as follows:
8
         LIMITATIONS ON STACKING COVERAGES
9
         IF YOU HAVE MORE THAN ONE MOTOR VEHICLE INSURED WITH US
10       AND, IF YOU OR ANY OTHER INSURED PERSON IS IN AN ACCIDENT:

11       A) IN YOUR INSURED CAR – WE WILL NOT PAY MORE THAN THE
            *UNINSURED MOTORIST* LIMIT OF COVERAGE FOR THAT
12          PARTICULAR INSURED CAR.

13       B) IN A MOTOR VEHICLE OTHER THAN YOUR INSURED CAR OR
            WHILE A PEDESTRIAN – WE WILL NOT PAY FOR MORE THAN THE
14          *UNINSURED MOTORIST* LIMIT OF COVERAGE WHICH YOU HAVE
            ON ANY ONE OF YOUR INSURED CARS.
15

16
     (Dkt. No. 29-1 at 20 (emphasis added in last two paragraphs).)
17
          Farmers contends that this language applies to *under*insured motorists as well because the
18
     policies define "*un*insured motorists" to include *under*insured motorists.  Ratnayake counters that
19
     the incorporation by reference of *under*insured motorists into the definition of *un*insured motor
20
     vehicle is unclear—that the Endorsement's mention of UM coverage (but not also UIM coverage)
21
     means that the Endorsement only validly limited stacking of UM coverage.
22
          Although Ratnayake is correct that a complete understanding of the Endorsement requires
23
     the insured to look at language in the policy, this relatively minimal labor does not render the
24
     Endorsement unclear.  The Endorsement was attached to each policy, rather than being sent
25
     separately at a later date.  The court must presume that Ratnayake read each policy and the
26
     attached Endorsement at the same time and gave a "plain, common-sense meaning to [their]
27
     provisions."  *Lawless*, 680 F. Supp. 2d at 1242.  Although the policies' definition of "*un*insured
28

7

1    motor vehicle" does not specify "*under*insured motorists" by that name, the definition of

2    *un*insured motorists, which includes a clear description of *under*insured motorists, is neither

3    ambiguous nor difficult to understand. (*See* Dkt. No. 29-3 at 14.) The average layperson would

4    understand that "uninsured motor vehicle" includes a vehicle that is insured for less than the

5    actual damages suffered and not just a vehicle that is entirely uninsured. Accordingly, the

6    Endorsement complies with the clarity requirement of NRS 687B.145(1).[5]

7                                  **2. Single Payment**

8            As set forth above, each policy provided coverage for the same risk: that a Class I insured

9    would be injured by an uninsured or underinsured motorist while the insured is in any of the three

10   insured cars. For the Endorsement to be valid and prohibit stacking (and thus entitle Farmers to

11   judgment), Farmers must prove that Ratnayake did not pay separate premiums under each policy

12   for that same coverage. Farmers has failed to do this.

13           The policies show separate UM premiums, but they are not lower in each successive

14   policy. Indeed, the opposite is true, as they rose from $43.30 for the Honda on January 22, 2010

15   to $150.70 for the Toyota on April 20, 2010. Farmers submitted a base rate schedule which

16   shows a significantly lower UM base rate for the geographic territory in which the Honda was

17   garaged (Territory 3) than the territory where the Nissan and Toyota were garaged (Territory 18).

18   This information alone indicates that the UM premiums for the Nissan and Toyota should be the

19   same, which they are not. Farmers explained that "[t]he multicar discount, along with other

20   applicable upcharges, discounts and surcharges, is applied to a base UM premium amount related

21   to the garage locations for the covered vehicles[.]" (Dkt. No. 37 at 17.) Yet Farmers did not

22   explain how this calculation was performed for the three policies at issue here. Supplying the

23   base rates is insufficient to prove that Ratnayake did not pay separate premiums for the same risk.

24           Moreover, only two of the three policies submitted as exhibits by Farmers state that the

25   UM premium is discounted because of limitations on stacking. (Dkt. Nos. 29-2 at 11 (Honda

26

27           [5] Ratnayake's argument that NRS 690B.020(3)'s narrow definition of "uninsured motor vehicle"
     precludes Farmers' more expansive definition fails because that statute defines the term only "for the
28   purposes of this section," not for the policies. NEV. REV. STAT. 690B.020(3).

                                                   8

1  policy, discount purportedly applied), 29-3 at 4 (Nissan policy, no UM discount), 29-5 at 4

2  (Toyota policy, discount purportedly applied).) Although these statements in the policy

3  declarations, standing alone, are insufficient to prove that the discounts were actually applied to

4  the UM premiums, the inconsistency among the policies weighs against Farmers.

5      In sum, Farmers has failed to prove that the Endorsement is a valid anti-stacking

6  limitation as a matter of law. Accordingly, Farmers is not entitled to judgment on the pleadings

7  for the first five claims.

8                           **3.  The Fraud Claim and Rule 9(b)**

9      Ratnayake claims that Farmers gave him two versions of the policy declaration page for

10  his Nissan policy. On July 15, 2010, he received the first document, which said nothing about a

11  UM premium discount for limitations on stacking. (Dkt. No. 1-2 at 39.) Five days later, he

12  received the second document, which asserted that he did receive such a discount. (Dkt. No. 1-4

13  at 48.) Ratnayake claims that he relied on the second document to his detriment by declining to

14  file another claim for UIM benefits under the Nissan policy.

15      Farmers argues, to no avail, that Ratnayake could not have relied upon the latter document

16  because it was an offer of renewal dated several months before the first document, which was a

17  copy of the policy itself. Farmers' argument actually strengthens Ratnayake's claim, because if

18  Farmers was aware that the latter document was a non-binding offer of renewal that was

19  superseded by the policy, Farmers should not have sent the offer of renewal to Ratnayake as part

20  of the correspondence concerning the coverage available to Ratnayake. Moreover, Farmers sent a

21  letter dated June 30, 2011 to Ratnayake stating that a UM discount was applied in the Nissan

22  policy. (Dkt. No. 33-1 at 161.) A reasonable inference from this chain of events is that Farmers

23  sent the offer of renewal to bolster its assertion in the letter that the Nissan policy included a UM

24  discount. If so, the date of the offer of renewal, which is in small print on the bottom of the page,

25  could have been overlooked in favor of the date of the correspondence.

26      The court does not now determine whether the Sixth Claim will be meritorious, but it

27  meets the pleading requirements of Rule 9(b). Ratnayake pleads the circumstances surrounding

28

1    the alleged fraud with particularity.  He pleads a misrepresentation by explaining the conflicting

2    information in the documents.  He pleads reliance by asserting that he would have filed another

3    UIM claim under the Nissan policy were it not for the alleged misrepresentation.  He pleads intent

4    generally, which is what Rule 9(b) requires.  Finally, the alleged facts concerning the

5    misrepresentation and reliance, along with other facts in the complaint regarding the claimed

6    insurance coverages, suffice to plead causation and damages with particularity.  Accordingly,

7    Farmers is not entitled to judgment on the pleadings for the Sixth Claim.[6]

8

9    **II.    Ratnayake's Motion for Partial Summary Judgment**

10           "[T]he court shall grant summary judgment if the movant shows that there is no dispute as

11   to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

12   56(a).  In other words, the movant has the burden to prove the absence of an issue of material

13   fact.  Ratnayake has failed to carry this burden.  As explained above, Farmers has failed to prove

14   the validity of the Endorsement.  Yet it is certainly possible that Farmers could introduce

15   additional evidence to prove that Ratnayake did not pay separate premiums for the same UM

16   coverage.  Consequently, Ratnayake's motion for partial summary judgment is denied.

17   / / / /

18   / / / /

19   / / / /

20   / / / /

21

22   _____

23   [6] Ratnayake newly argues in his response that the Endorsement is not enforceable because the
     Farmers agent who sold him the policies represented that they allowed for stacking.  (Dkt. No. 33 at 20.)
     Farmers replies that Ratnayake's new contention amounts to a new cause of action for fraud in the

24   inducement and that, accordingly, the Court should ignore it.  (Dkt. No. 37 at 12 (quoting *Navajo Nation v.*

25   *U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[W]here, as here, the complaint does not include
     the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is

26   insufficient to present the claim to the district court.")).)  The Court agrees with Farmers and disregards
     Ratnayake's apparent claim for fraud in the inducement.

27

28

10

**III.**   **Conclusion**

Based on the foregoing, the court hereby ORDERS:

1.  Farmers' motion for judgment on the pleadings (Dkt. No. 29) is DENIED.

2.  Ratnayake's motion for partial summary judgment (Dkt. No. 33) is DENIED.

DATED this 10th day of October, 2013.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE