1  J. CHRISTOPHER JORGENSEN (SBN 5382)
   LEWIS ROCA ROTHGERBER LLP
2  3993 Howard Hughes Parkway, Suite 600
   Las Vegas, Nevada 89169
3  Telephone: (702) 949-8200
   Facsimile: (702) 949-8398

4  THOMAS P. JOHNSON (Pro Hac)
   JANETTE L. FERGUSON (Pro Hac)
5  DAVIS GRAHAM & STUBBS LLP
   1550 Seventeenth Street, Suite 500
6  Denver, Colorado 80202
   Telephone: (303) 892-9400
7  Facsimile: (303) 893-1379

8  *Attorneys for Defendant*
   *Farmers Insurance Exchange*
9

10                 UNITED STATES DISTRICT COURT
11                      DISTRICT OF NEVADA

12 | NAYANANANDA RATNAYAKE, individually, | Case No. 2:11-cv-01668-APG-CWH |
13 | and on behalf others similarly situated, | |
14 |                      Plaintiffs, | **FARMERS INSURANCE EXCHANGE'S OPPOSITION AND POINTS AND AUTHORITIES IN RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
15 |                          vs. | |
16 | FARMERS INSURANCE EXCHANGE d/b/a FARMERS; and DOES I – V and ROES VI – X, inclusive, | |
17 | | **(HEARING REQUESTED)** |
18 |                      Defendants. | |

19      Defendant Farmers Insurance Exchange ("Farmers") respectfully submits the following

20
21 Opposition and Points and Authorities in Response to Plaintiff's Motion for Class Certification

22 (#46, "Motion").

23                            **INTRODUCTION**

24      In its Order Denying Plaintiff's Motion for Partial Summary Judgment (#43), this Court

25 held that Farmers' uninsured/underinsured ("U/M") anti-stacking provision was clearly stated

26
27 and prominently displayed in Farmers' policies, meeting two of the three requirements of N.R.S.

28

§687B.145(1). This left Plaintiff with only one theory of liability on which to base his request for class certification—that the putative class members uniformly "ha[ve] paid a premium calculated for full reimbursement under that coverage." *Id.*

Perhaps recognizing that individualized inquiries inherently attend such a theory of liability, Plaintiff has concocted a revisionist history of the U/M multi-car discount that Farmers adopted in 1993 to comply with Section 687B.145, and has grossly misconstrued certain data that Farmers presented to this Court to support removal of this matter—all in an effort to create a factual basis to support the certification of three subclasses. Plaintiff does not support his speculative theories with a single declaration or even one line of deposition testimony, and the theories unravel when compared with undisputed facts and a proper analysis of the removal data. For the reasons set forth below, Plaintiff's Motion should be denied.

## BACKGROUND

**During the Class Period, Farmers Provided Farmers Insureds with Appropriate Anti-Stacking Discounts Approved by the Nevada Division of Insurance.**

After the decisions in 1990 in *Torres v. Farmers Insurance Exchange* and *Bove v. Prudential Property and Liability Insurance Company*, Farmers proposed to the Nevada Division of Insurance a revision to its U/M multi-car discount to ensure its compliance with N.R.S. § 687B.145(1) and those two cases. In July, 1992, Farmers submitted to the Insurance Commissioner a proposed revision to increase Farmers' U/M discount from 10% to 28%. *See* Declaration of Morgan Bugbee ¶ 3, attached hereto as <u>Exhibit A</u> ("Bugbee Decl."). The Commissioner conducted a hearing on the proposed revision, at which Farmers' witness, Patricia Walker, made clear that the proposed 28% discount likely would be revised in later years based on subsequently-obtained Nevada-specific U/M data. *Id.* at ¶ 4. Specifically, she stated : "If this were approved we would need to, *in order to monitor the discount level and whether it's proper*

1    *later on*, we'll need to build up that data because right now our current data involves Nevada

2    data and involves the stacked claims." *Id.*

3        In July, 1993, the Nevada Division of Insurance issued an Order approving Farmers'

4    proposed 28% U/M multi-car discount.  The Order acknowledged that Farmers intended the

5    proposed increase to comply with Nevada case law requiring discounted rates to support any

6    anti-stacking provision.  *Id.* at ¶ 5.[1]

7        From at least 2002 through 2010, Farmers has applied different U/M discount rates to

8    different rate classes of drivers, all with the approval of the Division of Insurance.  *Id.* at ¶ 9.

9    The U/M multi-car discount rate for all classes of Farmers' insureds, when aggregated, was at or

10   slightly above 28% until 2008.  To determine the precise aggregated rate, however, one would

11   have to consider at least the amount of premiums collected in each rate class, a complicated

12   exercise.  That 28% discount rate was never established as a precise number in perpetuity

13   required for compliance with Section 687B.145(1) and related case law.  Rather, as reflected by

14   Ms. Walker's testimony and the Division of Insurance's approval in 1993 and thereafter of

15   Farmers' U/M multi-vehicle discount rates, that rate was expected to, and did, evolve based on

16   the data later gathered by Farmers' actuaries.  *Id.*

17

18        Since 1993, Farmers has revised its U/M multi-vehicle discount rates at least twice.  One

19   revision was in 2007, based on a 2006 rate filing.  *Id.* at ¶ 10.  That revision included different

20   discount rates for ten different rate classes, ranging from 18%-35%.  It appears that the overall

21   discount rate was increased, but, again, it is impossible to determine the overall rate discount

22   without at least knowing the amount of premiums collected in each rate class.  *Id.*

23

24

25   _____

26   [1] In 1994, Ms. Walker executed an Affidavit which reaffirmed that the purpose of the 1993
     increase in the U/M multi-car discount to 28% was to comply with the "premium discount
27   requirement of N.R.S. § 687B.145(1)" and the holdings of *Torres* and *Bove*, and that the 28%
     discount complied with the "premium discount" requirement of that statute.  *Id.* at ¶ 6.

28

The second revision occurred in 2008 and was based on a new actuarial multi-variate system for gathering and evaluating loss data for U/M and other coverages. *Id.* at ¶ 11. This revision resulted in a reduction in the U/M multi-car discount, to a level of approximately 23%. The multi-variate system was consistent with actuarial guidelines regarding property and casualty insurance rate making provided in actuarial standards published by the Actuarial Standards Board. *Id.* The proposed rates accounted for the presence of U/M anti-stacking provisions, because the rates were based, in part, on the observed differences between single- and multi-vehicle households. An anti-stacking provision contained in U/M coverage purchased by a single-vehicle household has no practical effect because there are no multiple coverages to stack. By calculating the proposed rates in part based on the differences between single- and multi-vehicle households, the discount captured the effect of the decreased risk associated with anti-stacking provisions. *Id.*

Beginning in 2010, Farmers revised its auto product. Household vehicles were covered by a single policy, and U/M coverage was priced and charged at the policy level and not the vehicle level. With the implementation of the new auto product, U/M coverage no longer was priced at the vehicle level and insureds no longer were charged a separate U/M premium on each separate household vehicle.

Several things are particularly significant about this history of Farmers' U/M multi-car discount rate. First, the Nevada Division of Insurance consistently has accepted Farmers' U/M multi-car discount as compliant with the dictates of N.R.S. § 687B.145(1) and *Torres* and *Bove*. Second, the discount has evolved into multi-tiered discount rates for each rate class of Farmers insureds, with the express approval of the respective Insurance Commissioners. Third, although not required by the statute, case law or the Division of Insurance, the aggregate discount rate

over all rate classes appears to have been at or above 28% until 2008, when a more sophisticated

actuarial system was implemented, which supported a lower overall discount rate, again

distributed unevenly among Farmers' rate classes.  Again, this rate revision was approved by the

Nevada Division of Insurance.  Finally, beginning in 2010, Farmers converted to a single policy

household system, after which insureds no longer were charged a separate U/M premium on each

separate household vehicle.

**Plaintiff Has Grossly Misconstrued the History and Application of Farmers' Anti-Stacking Discount and Farmers' Removal Data.**

More than 23 pages of Plaintiff's 29-page brief in support of class certification purport to

be "factual background" discussing the history of Farmers' U/M discount and analyzing the data

that Farmers submitted in support of its petition for removal.  Plaintiff's discussion and analysis,

and his representations concerning the data, are unsupported by any credible evidence, are

without foundation and are pure speculation. And they are flat-out wrong.[2]  The mistaken

assumptions which underlie Plaintiff's entire argument in support of class certification are so

numerous and so significant that Plaintiff's motion for class certification should be denied for

those reasons alone.

On October 14, 2011, Defendant removed this action from state court. *See*, Petition for

Removal (#1).  In order to remove an action to federal court under the Class Action Fairness Act

of 2005 ("CAFA"), 28 U.S.C. § 1332(d), a defendant must establish that the amount in

controversy exceeds $5 million. Where the complaint, as in this case, does not state a specific

amount in controversy, the defendant has the burden to produce evidence that demonstrates that

[2] Plaintiff has not taken a single deposition in this case, and his arguments reflect a complete lack
of understanding of the documents.  None of the "evidence" presented in Plaintiff's motion for
class certification would be admissible at a hearing on class certification, and should not be
considered for any purpose by this Court.

*based on the allegations of the complaint* it is *possible* that the amount of damages exceed $5,000,000. *McPhail v. Deere & Co.*, 529 F.3d 947, 955-56 (10th Cir. 2008). The amount in controversy simply is an estimate of the total amount in dispute, not an assessment of defendant's alleged liability. *Lewis v. Verizon Comm'ns, Inc.* 637 F.3d 395, 400 (9th Cir. 2010). Therefore, in its removal papers, Farmers presented evidence as to what the damages for each subclass *may* be *if the allegations in the Complaint were true*.[3]

    Premium damages (Subclasses A and B):  Plaintiff asserted in the Complaint that multi-vehicle households should have, *but did not* receive any rate discount for purchasing U/M coverage on multiple vehicles.  Complaint at ¶¶33, 34 & 41.  In order to estimate damage exposure *assuming Plaintiff's allegation were true*, Farmers designed a database search to recover data indicating which households had more than a single vehicle with U/M coverage, and how much those households were charged  in U/M premiums for that coverage.  Farmers then, *assuming no discount had been applied*, applied a range of discount factors to those premiums to determine the range of possible damages.  To substantiate its process, Farmers attached pages of the data search and recovery results. *See* Petition for Removal at ¶ 32, including Exhibits I & J thereto.

    Plaintiff misapplied and misinterpreted that data.  First, Plaintiff assumed that, for each household listed in the data, the first policy in number sequence is a "primary policy" for which, under Farmers' rate structure, a full U/M premium is charged.  Motion at 11.  He provides no support for this assertion, because there is none.  He then asserts, without any basis, that the household policies that follow sequentially are "secondary policies" that should reflect a U/M

---

[3] Defendant also stated that "no waiver and no admission of any fact, law or liability, including without limitation the amount, measure, or calculation of damage, if any is intended by the notice of removal and all defenses affirmative defenses and rights are reserved."  Petition for Removal at ¶ 42.

rate that is at least 28% lower than the primary policy. *See*, Motion at 11-15. Where there is no difference in the U/M premium charge between the "primary" and "secondary" policy (Subclass A) or less than a 28% difference in the U/M premium between the primary policy and the subsequent numbered policies (Subclass B), Plaintiff claims that Farmers did not comply with N.R.S. § 687B.145(1). The errors in this argument are numerous, significant and egregious:

- N.R.S. § 687B.145(1) requires that, for anti-stacking provisions to be valid and enforceable, insureds that purchase U/M coverage on more than one vehicle not pay full premiums for that coverage. The statute does not require any particular discount rate.

- As Plaintiff is aware, the Nevada Division of Insurance has approved Farmers' use of a multi-car discount as the method for complying with N.R.S. § 687B.145(1). Motion at 11 & attached Exhibit 4.

- Farmers rate system and procedures apply a multi-car discount. *See*, Bugbee Decl. ¶¶ 8-11. Documents evidencing this fact were produced during discovery in this case. *See* Rating Documents attached hereto as Exhibit B.

- The multi-car discount is applied *to each vehicle in the household* that has U/M coverage, not just the "secondary" policies. *See*, Declaration of Michael Abbene ¶ 14 ("Abbene Decl."), attached hereto as Exhibit C.

- The databases maintained by Farmers include information regarding the U/M premium *charged*. The databases do not reflect the pre-discounted U/M premium charge for each household. Abbene Decl. ¶9.

- Farmers' removal data reflects U/M premiums actually charged on each policy. *See* Petition for Removal at Exhibit I, ¶¶ 3 & 6-10. The data necessarily reflects U/M premiums charged on each household policy *after* the discount is calculated and applied.

- Therefore, the U/M premiums contained in the data recovery pages *are already discounted* and are *discounted on each policy in the household.*

Plaintiff also ignores that the initial 28% discount approved by the Nevada Commissioner of Insurance was a discount rate that was actuarially valid over 20 years ago, but did not include Nevada-specific data. Based on later actuarial data and analysis, that initial discount rate has changed over time and has been replaced by rate class-specific data. Changes to the discount

1    rate and the manner in which it was allocated among the rate classes have been approved by the

2    Nevada Division of Insurance.  Bugbee Decl. ¶¶ 9-11.  Plaintiff's liability theory that Farmers

3    must today provide every household a 28% discount rate on each "secondary" vehicle for which

4    U/M coverage is purchased is simply wrong.  Accordingly, Plaintiffs' analysis regarding the

5    "facts" purporting to support certification of premium refund subclasses A and B, starting on

6    page 11 and continuing through page 16, is completely flawed and does not support Plaintiff's

7    contention that this matter may proceed as a class action.

8        Claims damages (Subclass C): Plaintiff also asserted in the Complaint that multi-vehicle

9    households that had a U/M claim during the relevant time period should have been allowed to

10   stack the household U/M coverage because the anti-stacking language was void and

11   unenforceable.  Complaint at ¶¶31-32, 34 & 40.  As part of the removal process, in order to

12   estimate damage exposure assuming that allegation to be true, Farmers designed a search to

13   recover data indicating which households with multiple vehicles with U/M coverage made a

14   U/M claim during the relevant time period and were paid the per person limits of their U/M

15   coverage on the highest household limits policy.  Petition for Removal at ¶33 and Exhibits H &

16   K attached thereto.  The assumption, for removal purposes only, was that those households *may*

17   have been paid policy limits on their claim and *may* have had additional losses above policy

18   limits. *Id.*

19       Again, Plaintiff has misrepresented this data.  He asserts that, based on very limited

20   occurrences in the data where claim payments appear to exceed policy limits, Farmers did in fact

21   allow its insureds to stack U/M coverage and that this "fact" "demonstrate[s] that Farmers knew

22   or should have known that its anti-stacking endorsement is invalid."  Motion at 20.  However,

23   the evidence is that the collected data supporting Farmers' U/M rates and discounts is based on

unstacked U/M coverage. *See e.g.* Exhibit 8 to Bugbee Decl.; Stacking Statement provided to Nevada DOI, attached hereto as Exhibit D. The removal data does not contradict this evidence. Farmers' data provides the U/M limits for each policy. These limits are listed with the per-person limits first and the per-accident limits next. For example, 100/300 designates that the U/M limits on the policy are $100,000 per person and $300,000 per accident. Using these limits as an example, if more than $100,000 is paid on a claim, it may mean (and likely does mean) that there was more than one person in the vehicle, not that Farmers was stacking the limits of more than one policy. There are many other reasons that Farmers may have paid more than policy limits on a particular claim, such as negotiated resolutions of a disputed claim. Plaintiff's speculative efforts to explain limited anomalies allegedly seen in the removal data not only is groundless, but it demonstrates one reason (among many) why class certification is not proper in this case. In order to determine why the over-limits payments were made, one must investigate the underwriting and claims file for each circumstance, creating numerous individual issues that will predominate.[4]

## ARGUMENT

### I.    Legal Standard for Class Certification.

This Court must conduct a "rigorous analysis" to determine whether Plaintiff has met his burden to satisfy the requirements for class certification set forth in F.R.C.P. 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541, 2551-52 (2011). Before delving into the express class certification requirements of Rule 23, a court must first consider the implicit requirement of a precisely defined class. *See* 5 James W. Moore, *Moore's Fed. Prac.* § 23.21[1]

---

[4] Plaintiff also asserts that there are potentially 469 Subclass C members instead of a potential 439. Motion at 17-19. That may or may not be true, but is of no consequence to the class certification issue.

(3d ed.); *Mcgee v. East Ohio Gas Company*, 200 F.R.D. 382, 387 (S.D. Ohio 2001). Only if a class is properly defined, should the Court then consider the express requirements of Rule 23.

**Class Definition.** An implied prerequisite to class certification is a proper class definition. "Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." *Rader v. Teva Parenteral Medicines, Inc.*, 276 F.R.D. 524, 528-29 (D. Nev. 2011) (quotation omitted). A proper definition of a class must be "precise, objective, and presently ascertainable." *Id.* at 529.

A class definition is not presently ascertainable if it is not administratively feasible to determine whether a particular individual is a member of the proposed class. *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 63 (D. Nev. 1985); *see also* 5 James W. Moore, *Moore's Fed. Prac.* § 23.21[3][c] (3d ed.). A class definition is not administratively feasible if a court must make detailed factual findings to determine whether an individual is a class member. *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 2008 WL 413749, *5 (N.D. Cal. Feb. 13, 2008) ("The Court must be able to determine class members without having to answer numerous fact-intensive questions.").

A class definition also is not presently ascertainable where the class is defined by the validity of the purported members' claims. Such classes, sometimes referred to as "fail-safe" classes, are improper because the class is not ascertainable prior to a finding of liability. *See In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*, 289 F.R.D. 526, 545-46 (N.D. Cal. 2012) ("This is problematic because … the Court cannot enter an adverse judgment against the class."). A class definition that includes only those who are "entitled to relief" is defective because it "shields the putative class members from receiving an adverse judgment." *Randleman*

*v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). A class defined so that a class member drops out of the class once it is determined that the member cannot prevail is "palpably unfair to the defendant, and is also unmanageable—for example, to whom should the class notice be sent?" *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010); *see also Rader*, 276 F.R.D. at 529 ("A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a person is a member of the class."); *Hagen*, 108 F.R.D. at 63-64 (finding class definition insufficient because it would require the court to decide the merits of the claim at the class certification stage to determine who was included in the class).

**Express Requirements of Rule 23.** Plaintiff bears the burden to satisfy the requirements set forth in Rule 23 for each subclass. *Dukes*, 131 S. Ct. at 2551-52; *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981) ("[E]ach subclass must independently meet the requirements of Rule 23 for the maintenance of the class action"). To meet his burden, Plaintiff must present evidence that satisfies each Rule 23 requirement—the Court is not bound to accept the allegations on the face of the complaint. *Dukes*, 131 S. Ct. 2551-52 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.") (emphasis in original). The "rigorous analysis" required by Rule 23 often overlaps with the merits of the underlying claims because class determination involves considerations that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation omitted).

**Rule 23(a).** Rule 23(a) requires the plaintiff to show that (1) the class is so numerous that joinder is impracticable, (2) there are common questions of law or fact for the class, (3) the claims and defenses of the named plaintiff are typical of the claims and defenses for the class, and (4) the named plaintiff is an adequate representative. *Dukes*, 131 S. Ct. at 2551-52

**Rule 23(b).** In addition to Rule 23(a), the plaintiff must satisfy one of the provisions in Rule 23(b). The relevant provision here is Rule 23(b)(3), *see* Motion at 26-27, which requires Plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Rule 23(b)(3)'s predominance requirement is even more demanding than Rule 23(a), and requires courts to take a "close look" at whether common questions predominate. *Comcast*, 133 S. Ct. at 1432.

To satisfy Rule 23(b)(3), the plaintiff must show that liability can be determined on a classwide basis, i.e., that the evidence of liability is common for each class member. *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005). The evidence necessary to prove each of the elements of a claim determines whether a question is a common or individual question of fact and law. *Id.* at 566. Evidence offered to rebut elements of a claim also must be considered when weighing any common issues against individual issues. *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 787 (6th Cir. 2005) ("[A] court performing a 'predominance' inquiry under Rule 23(b)(3) may consider not only the evidence presented in the plaintiff's case-in-chief but the defendant's likely rebuttal evidence.").

Although "courts must be cautious about resolving disputes … that go to the merits of the case, it is the plaintiffs' burden to demonstrate that common evidence exists to support the claim that there may be classwide injury with proof common to the class, to warrant a ruling that common questions predominate … as required by Rule 23(b)(3)." *Spa Universaire v. Qwest*

*Commc'ns Int'l, Inc.*, 2007 WL 2694918, *8 (D. Colo. Sept. 10, 2007) (citing *Blades,* 400 F.3d 562). Accordingly, to establish the element of predominance, a plaintiff must advance a theory by which to prove "an element on a simultaneous, classwide basis, since such proof obviates the need to examine each class member's individual position." *Lockwood Motors, Inc. v. Gen. Motors Corp.,* 162 F.R.D. 569, 580 (D. Minn. 1995).

## II.    None of Plaintiff's Three Subclasses Satisfies the Class Definition Requirement or Other Requirements of Rule 23.

Plaintiff has failed to meet his burden with respect to all three subclasses proposed by the Motion. Due to the same individualized issues inherent in each subclass, certification is not proper because (1) none of the subclasses is "presently ascertainable," (2) individual issues predominate for each subclass, and (3) a class action is not the superior method to resolve Plaintiff's claims.

There are additional reasons to deny class certification. Subclass C, which seeks recovery of U/M benefits for bodily injury, requires mini-trials on the cause, reasonableness, and necessity of medical costs in addition to mini-trials addressing whether the insureds paid premiums which would render the anti-stacking provisions of the insurance contract void and unenforceable. Further, Plaintiff has failed to present any credible evidence with regard to the numerosity of any subclass.

### A.    All Three Subclasses Require Individualized Inquiries to Compare Actual Discounts with Required Discounts, if Any.

Each of the three subclasses advanced by Plaintiff suffers from the fundamental flaw that, under Plaintiff's theory of the lawsuit, a determination of whether an insured was entitled to a discount, and the comparison of the anti-stacking discount actually received by each insured, if any, with the discount to which the insured was entitled, requires a file-by-file, individualized inquiry.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.    <u>None of the three Subclasses is presently ascertainable.</u>

Each of the three subclasses is defined to include only insureds entitled to a discount who did not receive the discount to which they were allegedly entitled:

Subclass A:    All Nevada residents … (3) who were, under Nevada law, *entitled* to an anti-stacking discount …; and (4) who were not provided with *any* anti-stacking discount.…

Subclass B:    All Nevada residents … (3) who were, under Nevada law, *entitled* to an anti-stacking discount …; and (4) who were not provided the *legally required 28%* anti-stacking discount.…

Subclass C:    All Nevada residents … (3) who were, under Nevada law, *entitled* to an anti-stacking discount …; and (4) who were not provided *any* or the *legally required 28%* anti-stacking discount…; (6) who made a claim. . . .

Motion at 2-3 (emphasis in original).  These criteria render the subclass definitions defective for two reasons: (1) it is not administratively feasible to identify membership, and (2) membership is defined by the validity of a member's claim.

(a)    Identification of members of the three subclasses is not administratively feasible and individual inquiries must be <u>conducted</u>.

Plaintiff's theory of the case is that he and other class members were entitled to a 28% U/M multi-car discount and none of them received that 28% discount.  As we have shown above, that simply is not true.  However, even if his theory was more generally that each class member was entitled to a discount and did not receive a sufficient discount, an individual inquiry would be necessary to determine whether an insured was entitled to a discount, and the amount of the anti-stacking discount received compared to the required discount for each insured.

A file-by-file review would be required to determine whether the insured is entitled to a multi-vehicle discount, i.e. whether the insured actually has multiple U/M coverages on the same risk.  The criteria for Farmers' multi-car discount can serve as a proxy for this question, because

the risk for U/M coverages on multiple cars overlaps for household family members, and the criteria for the multi-car discount require that multiple vehicles are (1) kept at the same location, and (2) owned by a specified type of family member that resides in the same household.  Abbene Aff. ¶ 14.  The "kept at the same location" criterion is not satisfied where vehicles are in the possession of persons away from home attending school, and the discount is no longer available to family members that cease to be residents of the same household.[5]  *Id.*  These requirements show that there are many different reasons why insureds may not receive the type of discount in the subclass definitions.  *See, e.g., Randleman*, 646 F.3d at 354.  Thus, demonstrating the discount required for an individual insured cannot be accomplished solely with a database, and will do nothing to demonstrate the discount required for another insured.

Moreover, although Farmers' electronic database contains data that show U/M premiums charged on each policy, the database does not contain data that show what, if any, multi-car discount was provided on each household policy.  Abbene Decl. ¶ 9.  Instead, determining which insureds received what discount would require a detailed review of each insured's underwriting file.  *Id.* ¶ 10.  This process would require a reviewer to determine what U/M premium would have been charged without a multi-car discount, and compare that amount with the premium amount actually charged to the insured.  *Id.*  It is not enough to review an underwriting file to determine whether a multi-car discount is noted in the declarations page, because membership in the subclasses requires a determination of the *amount* of the discount provided.  *Id.* ¶ 11.

---

[5] Plaintiff's case presents a perfect example of the complexities in determining whether an insured is entitled to a multi-vehicle discount. Here, there is conflicting evidence as to whether all of the vehicles which are the subject of Plaintiff's lawsuit were garaged at the same location and which family members or relatives were living in the same household. (*See* Policy Docs attached hereto as <u>Exhibit F</u>.) The individualized nature of the issues is also highlighted by the liability inquiry the Court recognized would be required for Plaintiff, and presumably for all households. (Order Denying Plaintiff's Motion for Partial Summary Judgment (#43) at p. 8.)

An additional step is required because membership in the subclasses is defined in terms of an anti-stacking discount, but Farmers' pricing system only allows for a direct calculation of a multi-car discount. During the entire class period, Farmers priced its multi-car discount to reflect the expected cost of providing U/M coverage to multi-car customers on an unstacked basis. Bugbee Aff. ¶ 9. A discount attributable to an anti-stacking provision was embedded in the multi-car discount, because the rates proposed to the Nevada Division of Insurance were calculated to comply with N.R.S. 687B. *Id.* ¶¶ 6-11. Thus, the multi-car discount is not synonymous with the anti-stacking discount that Plaintiff contends is required by N.R.S. 687B.145. Rather, the magnitude of the anti-stacking discount contemplated by Plaintiff is lower than the magnitude of the multi-car discount. As a result, once the amount of an individual's multi-car discount is determined, an actuarial expert would need to consider the insured's risk characteristics to estimate how much of the multi-car discount should be attributed to anti-stacking. Abbene Aff. ¶ 12. Demonstrating the discount received by one insured cannot be accomplished solely with a database, and will do nothing to demonstrate the discount received by another.

A similar individualized inquiry is required to determine the amount of anti-stacking discount to which an insured is entitled. In order to show that an insured paid a premium calculated for full reimbursement under a separate coverage on the same U/M risk, *see* N.R.S. 687B.145(1), Plaintiff would need to establish an alternative and proper U/M rate on an individualized basis that takes into account an insured's individual risk characteristics. And, Farmers would be entitled to challenge Plaintiff's analysis on an individualized basis, because a particular U/M premium may not fit different insureds for different reasons.

Courts deny certification for defective class definitions where, as here, information necessary to ascertain a class is not available in a database and can only be determined with an individual file review. For example, in *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, the court denied certification of a subclass because the defendant did not maintain a database of the information necessary for ascertainment of the class and was not statutorily required to do so. 2008 WL 413749, *8-9 (N.D. Cal. Feb. 13, 2008) (Denying certification of subclass because information necessary for ascertainment of class members was "not contained in any of the electronic databases at issue, but can only be determined by an individual review of each potential class member's personnel file.").

In *Boucher v. First American Title Ins.*, the plaintiffs faced the same obstacles that preclude Plaintiff from articulating an administratively feasible method to ascertain class members. 2012 WL 3023316 (W.D. Wash., July 24, 2012). In *Bocher*, the court denied class certification because the defendant title insurance company's database was not capable of identifying insureds that allegedly overpaid title insurance premiums. *Id.* *4-6 (W.D. Wash., July 24, 2012); *see also Marcus*, 687 F.3d at 593 ("Some courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails.") (collecting cases); *see also Haskins v. First Am. Title Ins. Co.*, 2014 WL 294654, *13-14 (D.N.J. Jan. 27, 2014).

Accordingly, the definitions of each subclass are not proper, because it is not possible to determine that an insured did not receive a discount to which that insured was entitled without extensive and individualized fact-finding or "mini-trials." *See Marcus*, 687 F.3d at 592-93 ("If class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate.").

1

(b)    Membership in all three classes is expressly based on the validity of members' claims.

2

3    The definitions of all three subclasses fail for the additional reason that membership in

4    each class is based on the validity of a member's claim.  In *Randleman*, the plaintiffs alleged that

5    they did not receive a required discounted premium rate for title insurance, and defined a class to

6    include persons who "were entitled to receive" a discounted rate and who "paid more than the

7    [discounted] rate for such title insurance." *Randleman,* 646 F.3d at 349-50.  The court rejected

8    this definition as "an improper fail-safe class that shields putative class members from receiving

9    an adverse judgment." *Id.* at 352.

10    Here, the definitions of all three subclasses suffer the same flaw as the class definition

11    rejected in *Randleman* because each subclass is defined to include Nevada residents who were

12    "entitled to an anti-stacking discount" and who were not provided the legally required discount.

13    Motion at 2-3.  This definition is improper because no class member could be bound by an

14    adverse judgment, *Randleman,* 646 F.3d at 352, and because it requires the court to make a full

15    determination on the merits in order to identify individuals that must receive notice of the class.

16    *Rader*, 276 F.R.D. at 529 ("Because Plaintiff has define[d] [the] class in such a way that class

17    membership cannot be identified until the merits are resolved, class certification is

18    inappropriate.") (quotation omitted); *Hagen*, 108 F.R.D. at 63-64 (A class "definition is

19    insufficient [because] it would require the court to determine whether a person's constitutional

20    rights had actually been violated in order to determine whether that person was a class

21

22    member."); *see also* Manual for Complex Litig. § 21.222 (4th) ("The order defining the class

23    should avoid … terms that depend on resolution of the merits."); *Forman v. Data Transfer, Inc.,*

24    164 F.R.D. 400, 403 (E.D. Pa. 1995) (finding inappropriate a proposed class definition that

25    would require the court, in determining class membership, to "address[] the central issue of

26

27

28

liability to be decided in the case … [and] would essentially require a mini-hearing on the merits of each case").

Accordingly, Plaintiff has failed to define a presently ascertainable class. *See* Expert Report of Jack Ratliff at 6-7, 12, attached hereto as <u>Exhibit E</u>.

2.    Individual inquiries necessary to show required and
<u>actual discounts predominate all three subclasses.</u>

Plaintiff's failure to properly define the three subclasses is a reflection of the more fundamental problem that Plaintiff's theory of recovery is fraught with individualized issues. Individualized issues predominate all three Subclasses because there is no classwide theory that can establish entitlement to anti-stacking discounts, and because a file-by-file review is necessary to determine liability.[6]

Courts routinely find that the predominance and superiority requirements cannot be satisfied where, as here, liability turns on the type of file-by-file review necessary to establish liability. *See, e.g.*, *Randleman*, 646 F.3d at 352 (Plaintiffs failed to establish predominance because "under [the plaintiffs'] theory of the case, each [insured's] entitlement to the discount rate turns on an individual case-by-case analysis."); *Boucher*, 2012 WL 3023316, at *8 ("[P]roving or disproving each class member's claim depends on a file-by-file review of all class members' transactions.  This individualized inquiry is incompatible with a class action."); *Corwin*, 276 F.R.D. at 490 ("[I]nstead of liability being established 'in one stroke,' it would take an assessment of each transaction to determine if the absent class member qualified for the discount rate."); *Haskins*, 2014 WL 294654, at *14; ("The need to cull information that is not

---

[6] Although individualized issues defeat the commonality and typicality requirements in Rule 23(a), this section shows how these individualized issues defeat the predominance requirement of Rule 23(b)(3) because "Rule 23(b)(3)'s predominance requirement criterion is even more demanding than Rule 23(a)," *Comcast*, 133 S. Ct. at 1432, and the failure to satisfy Rule 23(b)(3) is dispositive of the Motion.

available electronically on a classwide basis in order to determine whether there was an overcharge and, if so, how much, renders this matter unsuitable for class certification.").

Plaintiff's cursory argument that the predominance requirement is satisfied addresses only the manner in which Plaintiff would calculate damages, Motion at 27, and as discussed above, that argument is flawed. Plaintiff's more serious problem is that he makes no attempt to explain how classwide liability issues could predominate over individualized issues. Moreover, Plaintiff cannot establish predominance merely by reciting the existence of some common issues, because the predominance "analysis presumes that the existence of common issues of fact or law has been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Plaintiff has thus failed to meet his burden to prove that Rule 23(b)(3) requirements are "*in fact*" satisfied. *Dukes*, 131 S. Ct. at 2551 (emphasis in original). Indeed, Plaintiff cannot even establish the more lenient commonality requirement here because demonstrating the invalidity of one insured's premium rate will do nothing to demonstrate the invalidity of another's.[7] *Dukes*, 131 S. Ct. at 2554 (holding that commonality cannot be established for discrimination claims where "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.").

---

[7] Additionally, the only theories of liability on a classwide basis set forth in the Motion are that N.R.S. 687B.145(1) and a 1993 Order of the Nevada Division of Insurance entitled insureds to certain discounts. Motion at 25. However, N.R.S. 687B.145(1) creates no rights to premium discounts. Instead, the only consequence of an insurer's failure to comply with the "double premium" clause is that the anti-stacking provision will be "void." *See, e.g.*, *Torres v. Farmers Ins. Exch.*, 793 P.2d 839, 844 (Nev. 1990) (Because anti-stacking provision was "invalid" under N.R.S. 687B.145(1), the plaintiff was "entitled to stack her two U/M coverage limits for an additional $15,000 in UM coverage."). And, as explained above in the Background section, the 1993 Order is not applicable to U/M rates charged during the class period. Thus, Plaintiff has failed to meet his burden to show that liability can be established on a classwide basis.

Accordingly, the Motion should be denied because liability as to each Subclass requires individualized inquiries that defeat the predominance requirements in Rule 23(b)(3).

3.    A class action is not the superior method to resolve any of
Plaintiff's claims.

In order to certify an action to proceed as a class, the Court also must find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." F.R.C.P. 23(b)(3). The superiority requirement under Rule 23(b)(3) overlaps with the predominance requirement. A class action is not a superior method for resolving disputes if the presence of significant individual issues renders management of a class action difficult. To determine superiority, courts consider the factors listed in Rule 23(b)(3), including "the likely difficulties in managing a class," and the "desirability or undesirability of concentrating the litigation of the claims in the particular forum." *See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 660 (D. Nev. 2009). Each of these factors weighs heavily against certification here.

Thousands of mini-trials will be required to determine membership in Plaintiff's proposed sub-classes and liability as to each class member. These mini-trials will require the Court to consider such individualized issues as (1) whether the insured was even entitled to a discount on UM premiums, (2) whether, when each household policy was issued, the UM premium charged was discounted, and (3) if the premium was discounted, was it sufficiently discounted to comply with N.R.S. 687B.145(a). For subclass C members, mini-trials would have to be conducted to determine whether each insured incurred any covered losses under the insurance contract. These mini-trials would  cause serious difficulties in managing a class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 *amended by*, 273 F.3d 1266 (9th Cir. 2001) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'") (quotation omitted).

The serious difficulties in managing these individualized eligibility and liability determinations substantially outweigh any benefit of proceeding with this action under Rule 23.

4.    A class action is not the superior method because the Nevada Division of Insurance is the superior forum.

A class action here is not a superior methodology for the additional reason that this forum is not the desirable (or even permissible) forum to litigate compliance with Nevada's Insurance Code on such a sweeping scale. Plaintiff's challenges to Farmers' approved premium rates should be addressed to the Nevada Division of Insurance in the first instance. The Commissioner has the expertise and resources to apply actuarial and experience loss data, and the Nevada legislature has given the Insurance Commissioner exclusive original jurisdiction over compliance with the Nevada Insurance Code. *See* N.R.S. 690B.031(3) ("*The Commissioner shall review and approve or disapprove* each policy of insurance that offers a reduction in the premiums provided for in this section.") (emphasis added).

The difficulty in judicially resolving challenges to rates charged in specialized industries is the reason the Nevada legislature authorized the Commissioner to approve insurance rates. Indeed, the filed-rate doctrine actually precludes courts from preempting administrative agencies which have primary jurisdiction over rates:

> [T]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved or has been made aware of as the law may require.

*Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 734 (S.D. Iowa 2007) (quotation omitted). In *In re System 99*, the Nevada Supreme Court held that the Nevada legislature had codified the filed-rate doctrine by enacting a set of statutes that required intrastate shippers to charge only the tariff rates which they had filed. 847 P.2d 741, 742 (Nev. 1993) (Holding that

filed-rate doctrine applied where a Nevada statute "prohibits a motor carrier from providing service for a rate less than the carrier's filed tariff rate unless the shipper is statutorily exempt from paying the filed rate.").

For the same reasons, the filed-rate doctrine applies here because Farmers is statutorily required to obtain approval from the Commissioner for premium rates, and is prohibited from charging or collecting rates that have not been approved. *See, e.g.*, N.R.S. 690B.031(3); *see also Rios*, 469 F. Supp. 2d at 737 ("Given the purposes of the filed rate doctrine, the filed rate doctrine would equally apply to the insurance industry, as to other industries, where a state agency determines reasonable rates pursuant to a statutory scheme."); *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 315 (Minn. 2006) (filed-rate doctrine bars challenges to homeowner insurance premiums); *Maxwell v. United Servs. Auto. Ass'n*, --- P.3d ----, 2014 COA 2, 2014 WL 51242 (Colo. App. Jan. 2, 2014) ("[T]o preserve the stability, uniformity, and finality inherent in rates filed with the [division of insurance], we conclude that the filed rate doctrine applies to Colorado's insurance industry. In so holding, we align our decision with the considerable weight of authority from other jurisdictions that have applied the filed rate doctrine to rate-making in the insurance industry.") (quotations omitted).

Accordingly, the filed-rate doctrine renders this Court an especially undesirable forum to resolve sweeping challenges to insurance rates charged and collected across an entire class of Nevada insureds. For this additional reason, Plaintiff has failed to establish the superiority requirement.

**B.     Individual Issues Also Predominate Subclass C Because Plaintiff's Claims Require Individualized Proof of Reasonable and Necessary Costs.**

On behalf of Subclass C, Plaintiff seeks recovery of U/M benefits on a stacked basis for insureds who allegedly paid U/M premiums that were not properly discounted as required by N.R.S. 687B.145(1). Plaintiff argues in the Motion that, once he proves that the anti-stacking provision in each member's U/M policy is void, he can prove liability and damages on a classwide basis by assuming that any insured who received the full amount of U/M coverage under one policy would necessarily have been entitled to U/M coverage provided under additional policies. Motion at 25. This assumption is a gross generalization that overlooks the individualized issues required to resolve liability, defenses, and damages. *See Torres*, 793 P.2d at 844 (holding an anti-stacking provision void, and noting that "[o]f course, [the plaintiff] will be entitled to indemnification only to the extent that she proves her actual damages in excess of the $15,000 she has already received.").

To prevail on a claim for unpaid U/M benefits and common law bad faith, "an insured must demonstrate fault by the tortfeasor *and the extent of damages* before a claim for bad faith will lie." *Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 384 (Nev. 1993) (emphasis added); *see also Allstate Ins. Co. v. Fackett*, 206 P.3d 572, 576 (Nev. 2009) ("The plain language of [N.R.S. 687B.145(2)] indicates that the insured can only recover for bodily injuries the insured personally suffers."). Thus, establishing liability on behalf of Subclass C would require mini-trials on the liability of the tortfeasor and the amount of damages suffered by each class member. At each of these mini-trials, Plaintiff and Farmers would be entitled to present evidence and argument on the cause and extent of each member's physical injuries, which includes analysis of the circumstances of each individual accident and a review of the members' medical records.

*See, e.g., Sherwin v. Infinity Auto Ins. Co.*, 2013 WL 5918312, *3 (D. Nev. Oct. 31, 2013) (entering summary judgment in insurer's favor on U/M bad faith claims after analyzing a detailed set of medical records).

Courts routinely deny class certification where liability turns on the necessity and reasonableness of medical costs. *Folks v. State Farm Mut. Auto. Ins. Co.*, 281 F.R.D. 608, 620 (D. Colo. 2012) ("[I]ndividualized determinations regarding entitlement to relief and damages owed would predominate over any common questions of law and/or fact" because the insurer would "be entitled to challenge whether the medical expenses or wage loss benefits claimed by the class member were in fact incurred as a result of the accident at issue and whether such costs were reasonable."); *see also MRI Assocs. of St. Pete, Inc. v. State Farm Mut. Auto. Ins. Co.*, 755 F. Supp. 2d 1205, 1208 (M.D. Fla. 2010) ("[A] medical necessity determination is specific to each individual claim.... The evaluation of a reasonable amount rests on an examination of the various factors on a case-by-case basis and can only be determined by a fact-finder."); *Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 531 (D. Md. 2001) (holding that individualized inquiries predominated because "the necessity and reasonableness of medical treatment [is] at issue.") (collecting cases).

In addition to evidence necessary to the *prima facie* case of each member, Farmers would present evidence and argument to prove the affirmative defenses of release and waiver of claims for additional U/M benefits. *See Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (the Court must "consider how a trial on the merits would be conducted if a class were certified.").

Finally, because each class member suffered a separate and discrete injury, Plaintiff cannot advance a rational method to calculate damages on a classwide basis for Subclass C. The

failure to do so alone is grounds to deny class certification. *See Rader*, 276 F.R.D. at 530-31 (Where "the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole ... the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried.") (quotation omitted); *see also Comcast*, 133 S. Ct. at 1433 ("Questions of individual damage calculations will inevitably overwhelm questions common to the class [because plaintiff's damages] model falls short of establishing that damages are capable of measurement on a classwide basis.").

Accordingly, certification of Subclass C should be denied for the additional reason that liability, defenses, and damages of claims for unpaid benefits will require individual trials.

### C. Plaintiff Has Failed to Establish Numerosity for All Three Subclasses.

Plaintiff has the burden to present evidence that there are in fact numerous parties. *Dukes*, 131 S. Ct. at 2551-52 (Rule 23(a) requires plaintiff to "prove that there are *in fact* sufficiently numerous parties...."). The only evidence presented in the Motion on numerosity is the flawed removal data analysis conducted by Plaintiff's counsel. Motion at 11-16. However, Plaintiff's analysis is fundamentally incorrect and does nothing to show how many insureds paid U/M premiums that were not properly discounted, if any. Thus, there is no evidence before the Court to establish the number of members in any of the subclasses.

The lack of evidence on numerosity is compounded with regard to Subclasses A and B, because the time limit for these classes is, as a matter of law, considerably shorter than the time period set forth in the Motion. The statute of limitations applicable to claims for unjust enrichment[8] shortens the time period by two years—the period must begin no earlier than

---

[8] Plaintiff does not specify which claims he seeks to assert on behalf of Subclasses A and B, but the unjust enrichment claim is the only claim asserted the in the Complaint on behalf of a class

September 8, 2007. *See* N.R.S. 11.190(2)(c); *Hundall v. Panola County*, 2007 WL 1521446, *4 (D. Nev. May 22, 2007) (Applicable statute of limitations for unjust enrichment claim in Nevada is four years). And, because Farmers switched to a platform where insureds paid single premiums for policies that covered multiple vehicles in 2011, the window is especially narrow for Subclasses A and B.

Accordingly, Plaintiff has provided the Court no evidentiary basis to determine the number of members in each subclass. This failure is an independent ground to deny certification, because Plaintiff's unfounded speculation on numerosity cannot satisfy the rigorous analysis required under Rule 23. *Knudsvig v. Espresso Stop, Inc.*, 2007 WL 2253371, *1 (W.D. Wash. Aug. 1, 2007) (Plaintiff's speculation regarding numerosity "cannot survive the 'rigorous analysis' that the Court must apply to determine class certification."); *see also Doniger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir.1977) (denying class certification where plaintiff proffered no "articulable facts" and submitted affidavits of plaintiff's counsel that were not based on personal knowledge).

that conceivably could fit Plaintiff's theory that insureds overpaid U/M premiums. *See* Complaint at ¶ 68. The other three claims asserted on behalf of a class each concern the payment of benefits. *See* Motion at 25; Complaint at ¶¶ 47-53 (contract claim for U/M benefits), ¶¶ 54-59 (common law bad faith claim for U/M benefits); ¶¶ 60-65 (statutory claim for unfair claim practices).

1

## CONCLUSION

2    For the reasons above, Farmers respectfully requests that the Court deny the Motion.[9]

3

4    DATED this 24th day of February, 2014

5                                                        DAVIS GRAHAM & STUBBS, LLP

6
                                                 BY:    *Thomas P. Johnson*
7                                                        THOMAS P. JOHNSON (Pro Hac)
                                                        JANETTE L. FERGUSON (Pro Hac)
8
                                                        1550 Seventeenth Street, Suite 500
9                                                        Denver, Colorado 80202

10

11                                                       J. CHRISTOPHER JORGENSEN
                                                        LEWIS ROCA ROTHGERBER LLP
12                                                       Nevada Bar No. 5382
                                                        3993 Howard Hughes Parkway
13                                                       Suite 600
                                                        Las Vegas, Nevada 89169
14
                                                        *Attorneys for Defendant*
15                                                       *Farmers Insurance Exchange*

16

17

18

19

20

21    [9] Plaintiff has attached to his Motion for Class Certification proposed notices to be sent
22    separately to each subclass of insureds. A classic cart before the horse. *See* Newberg on Class
      Actions § 8:11 (5th ed.) ("[O]rdinarily, notice to class members should be given promptly *after*
23    the certification order is issued.") (emphasis added, quotation omitted). Farmers also objects to
      the content of the proposed notices. For example, similar to Farmers' argument that Plaintiff has
24    failed to properly define a non-fail-safe and ascertainable class, the recipients of the proposed
      class notices are unable to ascertain whether they are members of any class and, if so, which
25    class. And, while the notice purports to define eligibility based on Farmers' records, as noted
      above, Farmers does not maintain records that would easily allow an eligibility determination.
26    The notice also is legally insufficient, misstates the law, is biased and misleading and contains
27    incorrect facts. Farmers reserves all objections to the proposed notices.

28

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on the 24th day of February, 2014, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of
3    a Notice of Electronic Filing on the CM/ECF registrants.

4

                             */s/ Sue Silcott* _____
5                                 An employee of Lewis Roca Rothgerber LLP

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28